Gary Adelman (GA7138)
BARTON, BARTON & PLOTKIN, LLP
420 Lexington Avenue, Suite 1830
New York, NY 10170
Phone: (212) 687-6262
Fax:   (212) 687-3667
*Attorneys for the Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MARGARET WALLACE,                              Civil Case No.: 07-Civ.-3899

                          Plaintiff,     Judge: Daniels

          -against-                     Magistrate: Pitman

SKUNK STUDIOS, INC., JASON CALDERONE,          **AFFIDAVIT OF**
TOM ESTESS, and KALLE WIK,                     **MARGARET WALLACE**

                          Defendant(s).
-------------------------------------------------------------X
STATE OF NEW YORK   )
                       ) ss:
COUNTY OF NEW YORK  )

      MARGARET WALLACE, being duly sworn, deposes and states under penalties of perjury as follows:

      1.     I am a shareholder of Skunk Studios, Inc. (hereinafter "Skunk Studios") and the Plaintiff in this action, and as such, I have complete knowledge of the facts as set forth herein.

      2.     The Affidavit of Defendant KALLE WIK in Reply to my Opposition to Defendants' Motion to Dismiss or in the alternative transfer venue to the Northern District of California is full of inaccuracies, mischaracterizations, and false inferences regarding the very real and ongoing business connections and contacts had and maintained between Defendant Skunk Studios, Inc. and various New York entities and forums.

      3.     As such, I respectfully request that this Court consider this Affidavit as a Sur-Reply to address those inaccuracies, half-truths, and attempts to hide the truth.

      4.     From the outset, it should be noted that since it's inception, Skunk Studios has been doing business with its ***New York City-based Intellectual Property attorney***, Jason Drangel

of Epstein, Drangel, Bazerman & James, LLP , whose sole office location is on 60 East 42nd Street, Suite 820, New York, NY 10165. As such, from this fact alone, it is difficult to see how Defendants can claim that they did not have sufficient transactions in New York.

5. Furthermore, putting aside contracts and negotiations Skunk Studios engaged in with New York companies, ***Skunk Studios has actually held events, press conferences, and business meeting, all right here in New York City***.

6. As a prime example, Skunk Studios actually organized a gathering in New York for the launch of its East Coast Office. That event was advertised as "***Skunk Studios Bites the Big Apple***" in the International Game Developers Association Newsletter (see EXHIBIT "A" and http://www.igda.org/Forums/showthread.php?threadid=19502). It is curious how a company, which explicitly targeted New York game developers, now attempts to argue that it is somehow unconnected to New York.

7. Moreover, Skunk Studios was an official sponsor of the New York City Casual Games Industry Party ***just this past January 2007*** (see EXHIBIT "B" and http://nycgames.org/pipermail/igda-nyc-announce/2007-January/000005.html)

8. In addition to just having traditional signed contracts, in order to establish a successful software development business, the company must attain visibility by engaging in constant information-gathering, ongoing networking, and publicity. As a result, while representing Skunk Studios, I had made ***numerous trips to New York on behalf of Skunk Studios***, and held regular contact with several New York companies in order to attain exposure of Skunk Studios in this region. I am certain that Skunk Studios continues to take these steps, even after my departure, in order to ensure the company's continued coverage.

9. I have also held courtesy ***business meetings in New York*** in behalf of Skunk Studios. Such meetings were held even if there was no *immediate* intention for the companies to work together.

10. While representing Skunk Studios, I also spoke at ***New York-based games conferences*** on behalf of Skunk Studios, such as the 4th Annual Games & Mobile Forum for example, which was held in New York City (see EXHIBIT "C" and http://www.gamesandmobile.com/2005.html).

11. Furthermore, Skunk Studios and myself, as its CEO, maintained contact with the ***New York press***, such as the New York-based "Business Week" and the "New York Times."

(Please see articles featured in both publications discussing Skunk Studios attached as EXHIBIT "D" and
http://www.businessweek.com/magazine/content/06_42/b4005090.htm?chan=smallbiz_smallbiz+index+page_success+stories and
http://query.nytimes.com/gst/fullpage.html?res=9F0CE6DB1730F933A25755C0A9629C8B63&sec=&spon=&pagewanted=all>.

12.     Defendant KALLE WIK attempts to paint a picture that contacts between Skunk Studios and New York entities are either minimal or outdated. To the contrary, this is far from the truth. I will address these misrepresentations and misleading statements regarding each company below.

### I. GAME TRUST, INC.

13.     Defendant KALLE WIK ***actually concedes*** that Skunk Studios has "entered into a contract with Game Trust, Inc.," a New York-based company for the publishing of Game Trust games on skunkstudios.com, but nonetheless attempts to argue that "Skunk Studios does not have any current business relationship with Game Trust Inc." and because that contract did not yield revenue for Skunk Studios, it is therefore allegedly insufficient.

14.     However, it is an uncontested fact that there was a contractual business relationship between Skunk Studios and a New York company, which was at the time believed to be gainful. A redacted copy of that contract, termed the "Game Services and License Agreement" is attached as EXHIBIT "E." In Paragraph 7.4 of that Agreement, Skunk Studios ***actually consents to a New York governing law provision.*** This demonstrates that Defendants *voluntarily* tied themselves to this forum.

15.     Furthermore, a press release was even printed announcing this transaction (see EXHIBIT "F" and http://launchnow.gametrust.com/news27.php?pid=news).

16.     In fact, as a Skunk Studios CEO, I had personally met and corresponded with several Game Trust officers in regards to doing business with Skunk Studios (see e-mail correspondences attached as EXHIBIT "G.").

17.     The fact that Skunk Studios did not report revenues from the agreement is due to Skunk Studios' failure to honor the parties' contractual obligations. Consequently, lack of revenues is actually irrelevant. It is illogical and unfair for Defendants to argue that since they essentially breached a contract with a New York company, they lack connection to New York

3

State. If anything, they should have expected to be haled into a New York Court as a result of that transaction alone. Defendants simply cannot be rewarded for their own malfeasance.

18. In regards to Defendant KALLE WIK's assertion that Skunk Studios' publishing of Game Trust games has ended in November 2005, this is without a doubt a misstatement of the situation. In fact, Defendnat KALLE WIK was actually considering expanding Skunk Studios' relationship with Game Trust by entering into discussions with several Game Trust representatives, namely Adeo Ressi, Brian Robbins, and Andre Zimiles.

19. Due to the foregoing, the existence of a contract with a New York corporation in which Skunk Studios actually agrees to apply New York Law, undoubtedly establishes a sufficient association to this State.

## II. BOONTY, INC.

20. KALLE WIK also claims that Boonty, Inc., another one of Skunk Studios' New York business affiliations, has its headquarters located in Paris, France. This is entirely disingenuous, as Boonty, Inc.'s website (which Defendants undoubtedly visited) unambiguously lists the address of its New York City corporate headquarters, as well as its Paris location (see EXHIBIT "H" and http://www.boonty.com/us/casual/howitworks.php?intMode=7&intIdSite=35&lang=US).

21. In actuality, Romain Nouzareth, the CEO of Boonty who has signed contract(s) with Skunk Studios on behalf of Boonty lives and does business in New York City. As such, Defendant KALLE WIK's contention that Skunk Studios has never had any relationship with Boonty or any of its New York employees or representatives is *simply untrue*.

22. KALLE WIK also suggests that Skunk Studios has not updated its contract with Boonty since the parties' initial agreement entered into three (3) years ago. On the other hand however, attached as EXHIBIT "I" is a relatively recent e-mail correspondence between KALLE WIK himself and Romain Nouzareth of New York City dated July 2006, which apparently shows that the two actively communicating.

23. In sum, Defendant KALLE WIK *is misrepresenting in his Affidavit* that there was no relationship with Romain Nouzareth of Boonty, Inc., while EXHIBIT "I" is proof of the existence of a continued business liaison with this New York company and its CEO, also a New Yorker.

### III. VIACOM INC.

24.     Defendant KALLE WIK also maintains that Skunk Studios has no connection with Viacom, Inc., a New York corporation, other than a distribution partnership with Shockwave.com, a San Francisco-based company acquired by Viacom.

25.     Defendants however ***neglect to disclose*** Skunk Studios' business dealings with MTV and Nickelodeon, both owned by Viacom and situated in New York. Attached as EXHIBIT "J" are e-mail correspondences with MTV and Nickelodeon covering a period of several months, a proposal submitted to Nickelodeon in New York City demonstrating the depth and duration of discussions, and a list of deal terms of Nickelodeon. Even if an actual contract was never signed, EXHIBIT "J" evidences significant business engaged in by Skunk Studios with several New York entities.

26.     Furthermore Shockwave, a major partner for Skunk Studios which was bought by Viacom in 2006 actually reports into Nickelodeon's Department, located in New York City.

27.     Moreover, Skunk Studios had a contract from 2001 or 2002 with VH1/Viacom for a work-for-hire game for the VH1 Paparazzi Game photo hunt game.

28.     Finally, Skunk Studios' dealings with other Viacom employees located in New York include Joseph Varet (Formerly of MTV, New York), Shaul Olmert (Vice President of Digital Products at MTV Networks, Kids & Family Division), and Kyra Reppen (formerly of Nick.com of New York City).

29.     As a result, Defendants certainly have sufficient business relations with New York's Viacom, Inc., as well as its New York affiliates. Defendants' denial of same is highly improper.

### IV. OBERON MEDIA, INC.

30.     Defendants ***admit to having a distribution contract with Oberon Media, Inc.***, a New York business, but deny that it is a major partner of Skunk Studios, suggesting that merely two percent (2%) of Skunk Studios' total income is derived from business dealing with Oberon Media.

31.     On the other hand, Oberon Media, headquartered in New York City, has actually ***loaned Skunk Studios monies*** to cover Skunk's legal expenses as recently as January 31, 2006

(see redacted loan agreement attached as EXHIBIT "K"). Certainly this qualifies them as notable partner of Skunk Studios.

32. Additionally, the two percent (2%) estimation is definitely a low one. Upon information and belief, the parties' distribution agreement is worth several million dollars. It is also important to note that in December of 2006, Skunk Studios re-negotiated the contract with Oberon in regards to higher royalty rates. As a result, its 2007 revenues from Oberon are expected to be considerably higher.

33. KALLE WIK's intimation that Skunk Studios does not deal with Oberon's New York office is simply absurd. I have personally negotiated with several of Oberon's officers from New York, such as Tal Kerret (Chairperson), Tomer Ben Kiki (Chief Executive Officer), and Ofer Leidner (Co-Founder). E-mail correspondences (attached as EXHIBIT "L") further detail the extent of the Skunks participation in and cooperation with Oberon.

34. As a final point, Oberon's marketing operations often occur in New York City.

35. Consequently, because Oberon is New York company with which Skunk Studios has a close-knit continued professional relationship, involving financing, expectation of increased revenues, and negotiations with New York officers, it is unquestionably linked to New York.

## V. NICKELODEON, INC.

36. Defendant KALLE WIK *misrepresents* in Defendants' Reply that I only had one (1) meeting with Nickelodeon, Inc., another one of many New York entities with which Skunk Studios maintains business relations.

37. To the contrary, there were several meetings and multiple correspondences with Shaul Olmert of Nickelodeon, headquartered in New York City, aside from the San Franciso meeting Defendants cite. In fact, that meeting actually occurred as a result of a ***series of on-site meetings with Nickelodeon in New York.***

38. Furthermore, Skunk Studios additionally held ***three (3) to four (4) meetings*** with Olmert/Kyra Reppen (at the time the Vice President and General Manager of New York's NickJr.com) and Paul Jelinek (former Vice President, Digital Media Products at MTV Networks), all of which took place in New York City.

6

## VI. EYEBLASTER, INC.

39. Defendants are insincere when they suggest that Skunk Studios has never had any negotiations with EyeBlaster, Inc., considering that here is actually a *press release from September 2006, which officially states that Real Networks and EyeBlaster intend to work with Skunk Studios* and implement its technology (See EXHIBIT "M" and http://www.eyeblaster.com/press_release.asp?section=recent_news&article_num=93).

40. Because of Skunk Studios' contractual relationship with Real Networks, I have personally had to interface with numerous individuals regarding integrating EyeBlaster. I have also met one-on-one with Ran Cohen of EyeBlaster for a demonstration of their service.

41. E-mails of these and other conversations and negotiations with EyeBlaster, *on which Defendant KALLE WIK was actually included,* are attached hereto as EXHIBIT "N." Because KALLE WIK must have been aware of these negotiations being that he received these correspondences.

42. Defendants' reply papers are either untruthful or attempts to hide the truth and must be brought to light by concrete documentary evidence establishing their abundant links, relations, and associations to and with New York State.

## VII. SKUNK STUDIOS' NEW YORK CLIENT BASE

43. Defendant KALLE WIK also engages in *misrepresentation* when he tells this Court that "it is impossible to determine what percentage of Skunk Studios worldwide user base lives in New York" and that "such demographic information is not provided to Skunk Studios."

44. In truth, Skunk Studios actually maintains a list of customers who have bought Skunk Studios' original game products directly from its websites (see a redacted sample of this log attached as EXHIBIT "O"). Any authorized Skunk Studios officer may simply look at Skunk's direct customer database, pull up this information, and determine how many New York individuals bought games directly from Skunk Studios over the past 5+ years. Additionally, Skunk Studios also has the ability and means of requesting its portal partners to break down how many New Yorkers purchased games from those portals.

45. It is furthermore nonsensical to suggest that a company selling video games online worldwide would not collect any demographic information from it customers. In our day and age, most sophisticated entities collect such data.

## VIII. DILUTION

46. Defendants ambiguously state in their Reply that my "shares of stock have absolutely not been diluted by any of the defendants." What does this mean? Does this mean that no dilution was engaged in or simply that my interest has not been "absolutely" diluted?

47. Defendants, it seems, diluted my shares, for they even informed me of this in a correspondence sent to me here in New York.

48. Perhaps Defendants merely could not engage in dilution at this point due to this Court's imposition of a temporary restraining order prohibiting this.

## IX. TESTIMONY OF NICK FORTUGNO

49. In regards to convenience of witnesses, despite Defendants' conjecture that my business partner Nick Fortugno does not have any relevant information regarding this action, because Mr. Fortugno has actually had ongoing discussions with Skunk Studios about its business, his testimony would be illuminating.

## X. CONCLUSION

50. Defendants in their Reply conceal vital facts regarding the extent of Skunk Studios, Inc.'s business contact with New York State. This Sur-Reply endeavors to set out the complete truth of the extent of Skunk Studios' professional relations with numerous New York businesses and residents, with concrete documentary evidence.

51. As the Exhibits hereto establish, Skunk Studios has substantial ties to New York. I believe that this is surely enough to meet the minimal "minimum contacts" jurisdictional requirement.

Due to the foregoing, I respectfully request that this Court deny Defendants' Motion to Dismiss for lack of jurisdiction and improper venue or in the alternative transfer venue in its entirety.

_____
MARGARET WALLACE

Sworn to before me this
11 day of July, 2007.

_____
Notary Public

Morgan Downer
Notary Public, State of New York
No.: 02DO6152128
Qualified in New York County
Commission Expires August 28, 2010